UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

        v.                                    Case No. 14-CR-99

DEVON HOWARD,

        Defendant.

DECISION AND ORDER SUSTAINING OBJECTION TO MAGISTRATE JUDGE'S RECOMMENDATION, REJECTING IN PART AND ADOPTING IN PART RECOMMENDATION (DOC. 108), AND DENYING MOTION TO SUPPRESS (DOC. 18)

Devon Howard, one of several defendants in this case, moves to suppress evidence obtained by the government after Howard's arrest. Following an evidentiary hearing, Magistrate Judge Patricia J. Gorence recommended that this court find that Howard was arrested without probable cause but that the motion be denied based on the inevitable discovery doctrine. The United States objects to the recommendation regarding lack of probable cause for arrest, while Howard has objected to the recommendation as to inevitable discovery and the ultimate ruling. This court held a second evidentiary hearing and allowed supplemental briefing.

Although a magistrate judge has authority to decide many motions, for a motion to suppress evidence a magistrate judge may only propose findings and make recommendations; the ultimate decision is for the district judge. 28 U.S.C. § 636(b)(1)(A), (B); Fed. R. Crim. P. 59(b)(1). The district court judge must review de novo the recommendations of the magistrate judge to which a party timely objects. 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(2), (3). Portions of a recommendation to which no

party objects are reviewed for clear error. *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999). The clear error standard means that the court can overturn the magistrate judge's ruling only if it is left with the definite and firm conviction that a mistake has been made. *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 943 (7th Cir. 1997).

The parties have not objected to Magistrate Judge Gorence's proposed findings of fact as stated, except that Howard contends that they are incomplete. Moreover, neither party objects to Magistrate Judge Gorence's recitation of law. In different ways both parties object to Magistrate Judge Gorence's application of that law to the facts. Therefore, as discussed below, the court adopts the proposed findings and recitation of law, with supplementation.

## PROBABLE CAUSE FOR ARREST

On April 4, 2014, a Verizon Wireless store on Sumner Street in Hartford, Wisconsin, was robbed at gunpoint. (1 Tr. 4-5, 41.[1]) Hartford Police Department (HPD) Sergeant Timothy Hayes responded to the store after a call came in about 11:46 a.m., and was the first officer on the scene. (1 Tr. 39.) The store is located in a corner of a strip mall. (1 Tr. 40; Exs., 1, 2.) Hayes spoke to two witnesses: store employee Eric Safranski and a customer named Marshall Retler. The witnesses stated that a man had come in from the rear of the building, threw a black duffle bag on the ground, and said he wanted phones. (1 Tr. 40-41.) Initially, Safranski thought it was a joke, but the man pulled out a pistol, cocked it, ordered the two men to a part of the store where the phones were located, and

---

1 The transcript from the first evidentiary hearing (held by Magistrate Judge Gorence) is referenced as "1 Tr." The transcript from the second evidentiary (held by this court) is referenced as "2 Tr."

told them to put the phones into the duffle bag. (1 Tr. 41, 48-49.) The witnesses described the robber as a black male, about 6'3", and skinny, about 150 pounds. (1 Tr. 40, 43, 48.)

Prior to the robbery, Safranski and Retler observed a tan Mercedes in front of the store. According to Hayes, the two witnesses

> Said that shortly before the robbery took place there was a tan Mercedes that was in front of the store with two subjects inside; and they appeared – in their opinion were watching them, watching the store.
> The individuals in the car do not go into any of the stores. They simply stayed and watched the store.
> After doing this for a few minutes, the Mercedes drove to the rear of the building out of their sight.
> And shortly after they went back there, the individual came up and robbed the store.

(1 Tr. 42.) The witnesses stated that after the store was robbed and the robber had fled out the back door, the robber ran in a direction to the left of the Mercedes and probably would not have been able to get in the vehicle. (1 Tr. 45, 49-50.) The Mercedes then came "flying from the back – one said zoomed at a high rate of speed and went onto Sumner Street." (1 Tr. 42.) Safranski commented that "he thought that this vehicle was some sort of decoy, getting the attention away from the actual robber where he was going after he committed the robbery." (1 Tr. 45, 51 (indicating that Safranski gave Hayes his opinion that the Mercedes might be involved in the crime).)

Neither witness was able to tell Hayes that the person who robbed the store came in the Mercedes. (1 Tr. 51.) However, Safranski was able to get the license plate number as the vehicle left the store, and Retler told Hayes that there was some sort of tape on the driver's side of the front bumper of the Mercedes. (1 Tr. 61.)

Hayes relayed the information he received from Safranski and Retler to HPD dispatch. (1 Tr. 52-53.) Hartford dispatch put out an "an armed robbery in progress" at the

3

Verizon store on Sumner Street and that a vehicle involved was a tan Mercedes with license plate number 308-VYP. (1 Tr. 5.) At approximately 11:45 to 11:50 a.m., Village of Slinger Police Officer Marshal Sutter, a 19 year veteran, heard the announcement of a robbery at a Verizon Store on Highway 60 in the City of Hartford. (1 Tr. 4-5.) The dispatch advised it was believed that the vehicle involved was a tan or beige Mercedes-Benz with plates similar to 308 Victor Young Paul or VYP and two occupants. (1 Tr. 5, 9.) Within approximately two minutes Officer Sutter saw the vehicle. (1 Tr. 5.) He advised the Hartford Police Department and the Washington County Sheriff of his observation and that he was behind the vehicle. (1 Tr. 6.) Officer Sutter noticed a lot of movement by the passenger who looked like "he was doing something with underneath the seat; moving his hand and arms a lot." (1 Tr. 6, 10.) At the request of the Hartford Police Department, Officer Sutter stopped the vehicle and treated it as a high-risk felony stop based on the Hartford dispatcher stating it was involved in an armed robbery and the possibility that the occupants may be armed , too. (1 Tr. 7.) Officer Sutter and several other officers drew their guns and pointed them toward the male and female occupants of the vehicle. (1 Tr. 7, 9.) The occupants were ordered out of the vehicle, ordered to get on the ground, handcuffed and separated. (1 Tr. 11, 12.)

The parties agree that there was reasonable suspicion justifying a *Terry*[2] stop of the Mercedes. Reasonable suspicion requires only a particularized and objective basis for suspecting legal wrongdoing. *United States v. Williams*, 731 F.3d 678, 683 (7th Cir. 2013). A warrantless arrest, however, requires probable cause to believe that a crime has been committed by the person being seized. *Gerstein v. Pugh*, 420 U.S. 103, 111-12, 95 S. Ct. 854 (1975).

---

2 *Terry v. Ohio*, 392 U.S. 1 (1968).

4

The question here is whether probable cause for arrest existed. Regardless of whether officers formally informed Howard or Bean that they were under arrest, the court finds that they were arrested and in custody when they were handcuffed and placed in the squad cars. As stated by Magistrate Judge Gorence,

> A law enforcement officer has probable cause to make an arrest "when the facts within the officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a prudent person in believing the suspect has committed or is committing an offense." *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003) (quoting *United States v. Sawyer*, 224 F.3d 675, 678-79 [7th Cir. 2000]) (internal quotation marks omitted). "Probable cause requires only a substantial chance of criminal activity, not an actual showing of such activity." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 [1983]). Mere suspicion is not enough. Nevertheless, "probable cause 'need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false.'" *Id.* (quoting *United States v. Burrell*, 963 F.2d 976, 986 [7th Cir. 1992]). The determination of whether probable cause exists in a particular situation involves examining the totality of the circumstances in a common sense manner. *Sawyer*, 224 F.3d at 679; see also, *Illinois v. Gates*, 426 U.S. 213, 238 (1983).

(Doc. 108 at 10-11.) This court adds that the relevant inquiry "is not whether specific conduct is innocent or guilty, but the level of suspicion attaching to particular kinds of noncriminal acts" in the totality of the circumstances. *United States v. Burrell*, 963 F.2d 976, 986 (7th Cir. 1992) (internal quotation marks omitted).

Magistrate Judge Gorence believed that the officers lacked probable cause to arrest Howard based on the totality of the circumstances. She thought the facts insufficient to establish a substantial chance that the occupants of the vehicle were accessories to the Verizon robbery, pointing to the lack of any witness statement that the robber had come to the store in the Mercedes, that the robber did not get into the vehicle after the robbery, that

5

neither Bean nor Howard matched the physical description of the robber, and that no evidence at the vehicle stop tied them to the robbery.

This court disagrees. For aiding and abetting an accomplice need only take an affirmative act in furtherance of the offense with the intent of facilitating the offense. *Rosemond v. United States*, 134 S. Ct. 1240, 1245 (2014). Aiding and abetting a robbery crime can occur through assisting in flight from the crime. *See United States v. Martin*, 749 F.2d 1514, 1518 (11th Cir. 1985). Here, the officers had sufficient reasonably trustworthy information to cause a prudent person to believe that Howard and Bean were aiding and abetting the armed robbery. Reasonable suspicion may have been aroused simply by the presence of the Mercedes in front of the store for an extended period of time, with the occupants simply watching the Verizon store rather than getting out and entering a store in the complex. The conduct of the vehicle's occupants was enough to draw the attention of Safranski and Retler, so much so that Safranski recalled the license plate which was displayed in the windshield and Retler noticed the tape on the car's bumper. But two important facts raise the circumstances to probable cause: the precise timing of the car's activity around the armed robbery and how the car sped off at a high rate of speed just after the armed robber ran past it. Police relied not on the mere presence of the Mercedes but the actions of the two occupants in watching the store, the uncanny timing of the car's movement to the back of the store just before the robber appeared from the back of the store, the car speeding off right after the robbery and Officer Sutter's observations of the car and its occupants that confirmed radio dispatches, within minutes of the robbery. That the armed robber did not get in the vehicle and that Howard and Bean did not match the description of the robber do not draw into question whether reasonably trustworthy

6

information existed to cause a prudent person to believe that Howard and Bean were accomplices.

In *Schaafsma*, probable cause existed when a suspected drug distributor meeting an undercover officer at a Hooters restaurant told the officer that he was brokering the deal for someone else, said that his buyer was waiting in the parking lot to take the illegal pills, and gestured at a blue Toyota with a man (Schaafsma) sitting alone inside. As the distributor was placed under arrest the Toyota left the parking lot at a brisk speed. The Seventh Circuit stated that the facts led "to the clear conclusion that the agents had probable cause to arrest Schaafsma as he tried to leave the Hooters lot." 318 F.3d at 722. The court recognized that "[w]hile mere presence at the scene of a crime is not enough to establish probable cause, we know that it is generally accepted that 'flight can be strong evidence of guilt.'" *Id.* The officers had flight, plus the dealer's reference to his buyer in the lot. The court found the district court's grant of a motion to suppress "not only puzzling, but wrong," stating that it had no trouble concluding that probable cause existed. *Id.*

In *Burrell*, the Seventh Circuit pointed to the need for some connection between the defendant and the alleged criminal activities. 963 F.3d at 987. It found such a connection in that case when a defendant (Henry) drove a car arriving near the site of a planned drug transaction almost immediately after one of the known participants arrived, and he stayed in his car watching the drug purchaser's van. The court stated that a "reasonably prudent person could conclude that Henry was involved in the drug transaction." *Id.*

Though the armed robber in the present case did not reference the occupants of the Mercedes in any way, the exquisite timing of the Mercedes's activity and its flight created a close link between the occupants of the Mercedes and the armed robber. The occupants

7

of the Mercedes acted suspiciously by simply sitting in the car, watching the Verizon store and never exiting to patronize any shop in a strip mall. The Mercedes, with two occupants, arrived shortly before the armed robber. Then, immediately after it drove to the back of the store, the armed robber entered the back of the store. And right after the armed robber ran past the Mercedes the car zoomed off at a high rate of speed. In the totality of the circumstances a reasonably prudent person would believe that the occupants in the Mercedes were acting in conjunction with the armed robber as a decoy or in some other aiding and abetting manner.

INEVITABLE DISCOVERY

Howard contends that if officers lacked probable cause to arrest him, much of the evidence obtained thereafter is "fruit of the poisonous tree" and inadmissible under *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407 (1963); *United States v. Budd*, 549 F.3d 1140, 1144 (7th Cir. 2008).

Naqur Bean and Howard were placed in separate rooms for interrogation at the Hartford Police Department. Bean was placed in the booking room and was approached initially by HPD Detective Erik Engebretsen, who read her *Miranda*[3] rights and asked if she understood them. Bean stated that she did and did not want to answer any questions, so Engebretsen stopped questioning her. (2 Tr. 6.) However, Bean did not request an attorney.

Engebretsen then spoke with Howard in the interview room attached to the booking room. (2 Tr. 6-7.) Engebretsen read Howard his *Miranda* rights. (1 Tr. 21, 2 Tr. 7.) Eventually, Howard provided statements and consented to a search of his cell phone (which

---

3 *Miranda v. Arizona*, 384 U.S. 436 (1966).

8

the HPD had in its possession, as it was left in the Mercedes) and vehicle; he signed written consent forms for both searches. (1 Tr. 74-75, 108-09; 2 Tr. 8.) Howard admitted to being involved in the Verizon robbery and indicated that Bean had driven him because he did not have a valid driver's license. Howard implicated a man named Dell (Londell King) as the armed robber. (*See* 1 Tr. 78.)

Howard expressed concern for Bean and asked to speak with her. (2 Tr. 13, 24, 45.) Engebretsen or HPD Sergeant James Zywicki may have told Howard that because they were still investigating the crime, Bean was not free to leave at that point. (2 Tr. 24-25.) One of the officers may have said that if Bean provided corroborating information to Howard's story that it was possible she could go home that night. (2 Tr. 26, 45.)

Engebretsen then brought Bean into the booking room.[4] (2 Tr. 25-26.) The officers allowed Howard to speak with her face-to-face in close proximity for ten or fifteen seconds. (2 Tr. 12, 26-27, 48-49, 56-57, 69-70.) Howard informed Bean that he had already told the truth about what had happened at the Verizon store and that she did not have to tell the officers that she and Howard had gone to Hartford to eat. (2 Tr. 13.) Engrebretsen and Zywicki stated under oath that they did not instruct Howard to speak with Bean. (2 Tr. 46, 57.)

Engebretsen then re-advised Bean of her *Miranda* rights and asked if she would be willing to answer his questions. She said yes and proceeded to implicate herself and Howard in the Verizon store robbery. (1 Tr. 79-80; 2 Tr. 13-14, 37.) She said that she and Howard acted as a lookout. (2 Tr. 14.)

---

4 At some point Howard had moved to the booking room. (*See* Tr. 53.)

9

Zywicki would not have allowed Howard and Bean to speak if Howard had not requested it. (2 Tr. 58.) Allowing suspects to confer is not common practice at the HPD. (2 Tr. 13, 25.)

After Howard's and Bean's statements on April 4, 2014, Londell King was arrested and interviewed, ultimately giving the police incriminating information about Howard and Bean. (1 Tr. 80; 2 Tr. 32.)

Prior to the events of April 4, 2014, local police and the FBI were already investigating a string of cell phone store robberies in the Milwaukee area. (1 Tr. 92; 2 Tr. 89-90, 115.) At that point, the only evidence linking Howard to the spree was information from a cooperating state defendant named Aaron Thomas, who claimed to have brought stolen cell phones to Howard's Milwaukee home following a January 2014 robbery of a RadioShack. (2 Tr. 117, 131.) A search of Howard's residence in January 2014 had yielded no evidence of crime. (2 Tr. 131.)

On April 5, 2014, HPD Detective Richard Thickens assisted in executing a search warrant at Howard's residence (1 Tr. 83, 2 Tr. 73), finding two items of evidence linking Howard to other cell-phone-store robberies (2 Tr. 124, 140). During the search, in the early afternoon of April 5, HPD Detective Richard Thickens was notified by a dispatcher that Howard had contacted HPD and wanted to talk with a detective about his case. (1 Tr. 83, 90; 2 Tr. 73.)

Thickens proceeded to the Washington County Jail, where Howard was held, arriving at about 4:30 p.m. (2 Tr. 74.) Thickens then conducted another interview of Howard. Thickens had not requested to speak with Howard; the interview occurred following Howard's request to speak with an HPD detective. (1 Tr. 84.) Thickens reminded Howard

10

of his *Miranda* rights. (1 Tr. 90; 2 Tr. 76.) Howard stated that over the previous several months he had been involved in the sale of cell phones after purchasing phones from Dell and someone named Robert Bishop. (1 Tr. 85; 2 Tr. 76.)

Magistrate Judge Gorence sufficiently set forth the following applicable law:

> "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *United States v. Budd*, 549 F.3d 1140, 1144 (7th Cir. 2008) (alteration in original) (quoting *Segura v. United States*, 468 U.S. 796, 804 [1984]) (internal quotation marks omitted). Thus, evidence obtained as a result of an illegal arrest is fruit of the poisonous tree and must be excluded unless the government "can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 432, 444 (1984); *see also Swift*, 220 F.3d at 507.
>
> Evidence is not "'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Wong Sun*, 371 U.S. at 487-88. Rather, the question is "whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488 (quoting Maguire, *Evidence of Guilt*, 221 [1959]).

(Doc. 108 at 18-19.) To determine if a statement is sufficiently attenuated from an illegal taint to be admissible, the court assesses (1) the voluntariness of the statement; (2) the temporal proximity of the arrest and statement; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S. Ct. 2254 (1975).

The court concludes that Howard's statement to Thickens on April 5, 2014, was sufficiently distinguished from the arrest to be purged of any taint. *Howard* initiated the contact with the HPD, with no pressure to do so by law enforcement. The statement was voluntary. Had Howard not called the HPD, Thickens would not have traveled from

11

Milwaukee to the Washington County Jail to meet with him. Howard's call to the HPD occurred the day *after* his arrest and after being transported from HPD headquarters to the Washington County Jail in the custody of the sheriff; the break in time and custodian show a meaningful separation to purge any taint. And even after initiating the contact, Howard had several hours to reconsider talking with an HPD detective. Thickens received the message from dispatch in the early afternoon but did not arrive at the jail until around 4:30 p.m., and Thickens reminded Howard of his *Miranda* rights. Finally, any police conduct in relation to the arrest was not flagrant. Reasonable minds may differ on the probable-cause determination, and, at the very least, it was a close call in the field, under time-pressure.

In addition, the court concludes that Bean's confession is not fruit of the poisonous tree. Howard contends that Bean's statement implicating him came about as a direct result of his illegal detention and encouragement to confess while he was being held at the police station. The government responds that Howard asked to speak with Bean, that Bean chose to implicate herself and Howard in the robbery, and that Howard cannot assert Bean's constitutional rights. The parties offer conflicting views of whether the police or the defendant engineered the meeting between Bean and the defendant that preceded Bean's confession.

Bean's initial refusal to talk to police about the robbery and maintenance of that silence for several hours reasonably suggests that Howard's encouragement directly led to her confession. But *Howard* chose to speak with Bean. The HPD officers would not have allowed the two suspects to interact had Howard not requested it. Even if it is assumed that Howard's arrest was without probable cause, Bean's statement at HPD headquarters

12

implicating Howard was not obtained by HPD's exploitation of that illegality. Howard's decision to speak with Bean caused the latter's statement to be sufficiently attenuated from any illegality.

In light of these rulings, the court sees no need to address whether law enforcement's investigation inevitably would have led to Howard based on information from the internet, Robert Bishop, and other suspects.

## CONCLUSION

For the reasons stated above,

IT IS ORDERED that the magistrate judge's recommendation (Doc. 108) is rejected as to the probable cause issue and adopted as to the inevitable discovery issue, and the motion to suppress (Doc. 18) is denied.

IT IS FURTHER ORDERED that an in-person scheduling conference (with defendants present) is set for February 29, 2016, at 11:00 a.m., to set further proceedings in the case.

Dated at Milwaukee, Wisconsin, this 26th day of February, 2016.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE